**SIGNED THIS: April 01, 2009**

_____
**THOMAS L. PERKINS
UNITED STATES CHIEF BANKRUPTCY JUDGE**

_____

### UNITED STATES BANKRUPTCY COURT
### CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| POWELL, Clarence and Betty J., | ) | No. 08-82538 |
| | ) | |
| Debtors. | ) | |

### O P I N I O N

The Chapter 13 Plan filed by the Debtors, Clarence and Betty Powell (individually "CLARENCE" and "BETTY," together the "DEBTORS") is challenged on two grounds. An unsecured creditor, "I NEED CASH INC." (INCI), alleges that the Plan was filed in bad faith. A secured creditor, Ford Motor Credit Company LLC (FMCC), alleges that the Plan violates the anti-bifurcation provision of the hanging paragraph. The matter is under advisement following a trial on March 2, 2009.

CLARENCE earns a living as an over-the-road truck driver and, to a lesser extent, as a private pilot. He operates both enterprises as sole proprietorships. BETTY works as a security guard and has a second, unspecified, part-time job. In addition, CLARENCE, who is 66, receives social security.

The DEBTORS filed their Chapter 13 petition on September 22, 2008. About a year and one-half earlier, on March 26, 2007, within 910 days of the filing, CLARENCE purchased a new 2007 Lincoln Town Car from a dealership in Geneseo, Illinois, financing his purchase with FMCC. The Retail Installment Contract discloses the vehicle's cash price of $46,961.48, a down payment of $2,400, negative equity on a trade-in of $5,766.96, an extended service contract purchased for $1,205 and GAP insurance for $550. The amount financed of $54,329.78 was payable with interest at 7.9% in 72 monthly payments of $949.93. The Certificate of Title identifies CLARENCE as the sole owner and lists his address as his residential street address.

In their Schedules, the DEBTORS value the Lincoln at $24,000. They also disclose ownership of a 2006 Harley Davidson Ultra Classic motorcycle valued at $13,000 and an interest as lessees of a 2006 Ford pickup leased to the DEBTORS through FMCC. FMCC filed a claim on the Lincoln loan asserting a petition date balance of $50,139.82.

In their Plan, the DEBTORS propose to bifurcate FMCC'S claim secured by the Lincoln into a secured claim for $24,000 payable with interest at 7%, with the balance unsecured. They also propose to reject the lease of the Ford pickup. They further propose to retain the Harley, in which LaSalle State Bank has a security interest. FMCC objects to the bifurcation of the Lincoln claim as contrary to the unnumbered hanging paragraph located immediately following Section 1325(a)(9) of the Bankruptcy Code.

As a general matter, by eliminating Section 506(a), the hanging paragraph precludes the bifurcation, or strip-down, of an undersecured loan, thereby leaving the parties to their contractual entitlements. *In re Wright,* 492 F.3d 829, 832 (7th Cir. 2007). The issue here,

2

given that the hanging paragraph only operates if the motor vehicle is "acquired for the personal use of the debtor," is whether the Lincoln was purchased by CLARENCE for his "personal use" or not.

The term "personal use" means, simply, non-business use. *In re Grimme,* 371 B.R. 814 (Bankr.S.D.Ohio 2007); *In re Lowder,* 2006 WL 1794737 (Bankr.D.Kan.). In applying the personal use test, it is the intention of the acquirer at the date of acquisition that is controlling. *In re Cross,* 376 B.R. 641, 648 (Bankr.S.D.Ohio 2007). When the evidence shows that a vehicle has been acquired for business purposes, the hanging paragraph will not apply and bifurcation is allowable. Conversely, if the evidence shows that a vehicle was acquired for non-business purposes, the hanging paragraph will apply and bifurcation is not permitted. *Grimme,* 371 B.R. at 816.

The intended use of the vehicle must have more than just an incidental relationship to the debtor's livelihood. For example, driving to and from work is not a business purpose. *Lowder,* at *4. Examples of a business purpose include where the debtor's employer required him to have a particular vehicle to conduct the business of the employer, and paid for its costs and expenses to operate, or where the debtor actually uses the vehicle within the scope of employment. *Id. See also In re LaDeaux,* 373 B.R. 48, 50 (Bankr.S.D.Ohio 2007) (vehicle not acquired for personal use where it was purchased solely to care for foster children which enabled debtors to create 20% of their income); *In re Garrison,* 2007 WL 1589554 at *2 (Bankr.D.Alaska 2007) (where vehicle was utilized for the debtor's newspaper and mail delivery business, use was substantially for business purpose

and hanging paragraph did not apply).

CLARENCE does not contend that his use of the Lincoln generates income, or that his employer requires him to drive it or pays some or all of the expenses related to its use, or that he uses the Lincoln in the scope of his employment. His argument centers around the circumstance that he claims a business expense tax deduction for a portion of the Lincoln's expenses and he keeps a vehicle mileage log as corroboration.

The Internal Revenue Code allows a taxpayer to deduct ordinary and necessary expenses incurred in carrying on a trade or business as well as a separate deduction for depreciation of property used in a trade or business. 26 U.S.C. § 162(a) and § 167(a). Where those expenses derive from the use of an automobile, however, the deduction will be disallowed unless the taxpayer satisfies strict substantiation requirements. 26 U.S.C. § 274(d). The taxpayer must substantiate the automobile expenses by adequate records, such as a mileage log and receipts for expenditures, of the amount of the expense, the time and place of the automobile's use, and the business purpose of its use. *Fisher v. C.I.R.*, T.C. Summ. Op. 2008-35, 2008 WL 941685 (U.S.Tax Ct.) To be deductible, the claimed expenses must have been incurred by the taxpayer in the conduct of his trade or business. Expenditures made in investigating potential deals or business opportunities are generally not deductible. *Walet v. C.I.R.*, 31 T.C. 461 (1958), *aff'd*, 272 F.2d 694 (5th Cir. 1959). It is not a condition of deductibility that the automobile be purchased with the intent to use it for business purposes or that some minimum percentage use for business purposes actually

occurs.[1]

CLARENCE testified that when he purchased the Lincoln on March 26, 2007, he intended to use it primarily for business purposes. He testified that his primary personal vehicle is a Harley Davidson motorcycle, at least in good weather. As pointed out by FMCC, his assertion of his intent is contradicted by the Retail Installment Contract's identification of the "Use for Which Purchased" as "Personal" and not "Commercial." CLARENCE argues that the seller, not he, checked the box for "Personal" use. Whether CLARENCE was asked by the Lincoln dealer about his intended use of the vehicle at that time is not a part of the record.

CLARENCE testified that he kept a Motor Vehicle Mileage Log reflecting his use of the Lincoln for business purposes in 2008. He did not maintain a mileage log in 2007, though he said his business use of the Lincoln that year was similar to 2008. FMCC argues that the Mileage Log evidences that the Lincoln was used mostly for non-business purposes in 2008.

The Mileage Log reflects 40 trips totaling 4,180 miles. It reflects that 6,281 miles were driven between January 15, 2008 and December 7, 2008. So, according to the Mileage Log, in 2008, the Lincoln was used for an alleged business purpose 66% of the time. The purpose of 18 trips is described by the cryptic notation "Load Boards." The purpose of 13 other trips is identified as "Looking at trucks" or "Looking at trailers" or "Looking at

---

[1] The fact that CLARENCE intends to claim a business expense deduction for the Lincoln on his 2008 federal income tax return is neither here nor there. The IRS deduction allowance conditions are not applicable to the personal use issue under the hanging paragraph. In any event, since he did not claim the deduction in 2007 and, at the time of trial, had not yet filed his 2008 return, CLARENCE cannot bolster his position in bankruptcy court by arguing that the IRS actually allowed a business expense deduction for the Lincoln.

equipment." Three other entries describe travel to Peoria for meetings with lawyers.

None of the Log's entries was explained by CLARENCE. In the absence of explanatory testimony, the Court cannot conclude that the trips listed in the Mileage Log had a sufficient nexus to CLARENCE'S job as a truck driver to be justifiably characterizable as business trips.

CLARENCE is an owner-operator leased to PACER. He owns a 2000 Peterbilt semi-tractor and a 1998 Wilson trailer that he uses as an over-the-road truck driver. He may have looked at trucks or trailers on 13 occasions in 2008, but he did not make any purchases. Looking at that equipment generated no income and was not related to the performance of his job. The three trips to see his lawyer, presumably his bankruptcy lawyer, are also unrelated to his job.

It is also difficult to understand why 18 car trips were reasonable or necessary for CLARENCE to examine Load Boards, given the prevalence of Load Board information available over the internet, and given the fact that he is leased to PACER. CLARENCE'S failure to explain these trips leaves the Court in the dark. Even assuming those trips qualify as legitimate business trips, CLARENCE'S use of the Lincoln in 2008 for legitimate, provable business purposes, falls far short of 50% of the actual miles driven.

The other significant fact that cuts against CLARENCE'S position, is that he owned the Lincoln for 9 months in 2007, yet did not keep a mileage log that year, and did not claim any business expense deduction for the Lincoln on his 2007 federal income tax return, which is part of the record. This circumstantial evidence, closer in time to the March, 2007,

purchase than the evidence of the Lincoln's use in 2008, contradicts CLARENCE'S self-serving testimony that his intent at the time of the purchase was to use the Lincoln primarily for business purposes.

Based upon all of the evidence in the record, the Court determines that the DEBTORS have failed to carry their burden to prove that the Lincoln was not acquired for personal use. Accordingly, the hanging paragraph precludes the bifurcation of FMCC'S claim. FMCC'S objection to confirmation will be sustained and confirmation must be denied.

In its Objection to Confirmation, INCI focuses on the loan obtained by BETTY three days before the bankruptcy filing, characterizing the loan as a scheme to obtain the court costs and attorney fees needed to file the bankruptcy case.[2] INCI relies upon the following provision in the loan agreement signed by BETTY on September 19, 2008, contained in the paragraph headed Customer's Representations and Warranties:

> You further represent and warrant that you are not a debtor under any proceeding in bankruptcy, insolvency, or reorganization and that you have no intention to file a petition for relief under any chapter of the United States Bankruptcy code.

BETTY must have intended to file her bankruptcy case at the time of the loan on Friday, September 19, 2008, says INCI, since she filed three days later on Monday, September 22, 2008.

To the contrary, says BETTY, she was attempting to avoid filing bankruptcy by effecting a work-out with FMCC, a creditor that was demanding full cure of an existing

---

[2]On January 11, 2009, INCI filed an adversary complaint pursuant to Section 523(a)(2), seeking a determination that BETTY'S debt is not dischargeable, alleging that BETTY intended to file bankruptcy at the time of the loan.

7

arrearage. From the $1,500 borrowed from INCI, she wired $1,000 to FMCC on the afternoon of September 19, 2008. According to BETTY, that payment was not enough for FMCC to call off a threatened repossession, thereby necessitating the bankruptcy filing.

The DEBTORS completed credit counseling on the morning of September 22, 2009, and filed their petition at 1:00 p.m. that afternoon. BETTY paid her attorney $1,000, of which $500 was the rest of the INCI loan proceeds, for the filing fee and an advance payment of $726.00 for the attorney fee. She paid the credit counseling fee with a credit card.

The obligation of good faith is imposed on a Chapter 13 debtor at two stages of the proceeding. The petition itself must be filed in good faith and the Chapter 13 Plan must be filed in good faith. *In re Smith,* 286 F.3d 461, 465 (7th Cir. 2002). INCI argues that a lack of good faith accompanied the filing only of the Plan, not the petition. INCI advocates conversion to Chapter 7 rather than dismissal as its preferred remedy.

When a petition is challenged as lacking good faith, the focus is ordinarily on the debtor's intentions and reasons for filing bankruptcy. *See, e.g., In re Haque,* 334 B.R. 486, 489-90 (Bankr.D.Mass. 2005) (filing to forestall foreclosure with no intent of financial rehabilitation lacked good faith). When a plan is challenged as lacking good faith, the focus narrows to whether the plan demonstrates an effort to pay creditors to the reasonable limit of the debtor's ability. *Smith,* 286 F.3d at 466. A totality of the circumstances analysis is appropriate, however, and the debtor's prepetition conduct may be examined.

In *Smith,* a creditor, Ms. Watson, argued that the debtor's prepetition fraudulent conduct that gave rise to her claim, demonstrated that his plan was not filed in good faith,

8

where the plan proposed to pay her far less than the amount of her claim. The court rejected Ms. Watson's argument, reasoning that the proper question is whether the plan is proposed in good faith, not whether the debt was incurred in good faith. *Id.* at 467. The court recognized that a plan could be confirmed despite egregious pre-filing conduct where the plan represents a good faith effort to pay creditors. *Id.*, citing *Neufeld v. Freeman*, 794 F.2d 149, 153 (4th Cir. 1986). The Seventh Circuit's reasoning is applicable here and is further buttressed by the existence of the remedy of nondischargeability, a remedy that INCI is pursuing in tandem with its plan objection.

So, even if BETTY fraudulently obtained the loan from INCI, that by itself is not sufficient to warrant a bad faith plan determination. The more difficult question with respect to good faith is the DEBTORS' proposal to retain and pay for the Lincoln, a luxury automobile. Under the Plan as proposed, it would take four years to pay off the claim secured by the Lincoln and the DEBTORS' attorney fees. Unsecured creditors would receive no distribution until the fifth year of the Plan. Under these circumstances, the question arises whether the DEBTORS are really trying to pay their creditors to the best of their ability, or whether they are attempting to retain and pay for a luxury vehicle at the expense of their other creditors. Because of the Court's ruling that the Lincoln loan may not be bifurcated, however, it is not necessary to decide that issue.[3] The Plan is already not confirmable because it violates the hanging paragraph.

---

[3] If the DEBTORS file an Amended Plan proposing to keep and pay for the Lincoln at the full amount of FMCC'S claim, such a plan would lack good faith.

This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate Order will be entered.

###